**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

ELECTRONICALLY
FILED
Apr 16 2020
U.S. DISTRICT COURT
Northern District of WV

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | Civil Action No.  **1:20-CV-70 (Keeley)** |
| **Plaintiff,** | |
| **v.** | |
| **PHILLIP W. CONLEY,** | **JURY TRIAL DEMAND** |
| **Defendant.** | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") files this Complaint against defendant Phillip W. Conley ("Conley") and alleges as follows:

## SUMMARY

1.     This matter involves an offering fraud orchestrated by Conley, a Morgantown, West Virginia-based former registered representative, in which he raised approximately $5.2 million from at least 20 investors through the fraudulent offer and sale of securities.  Conley convinced some of his most trusting investors, including pastors and church congregants, to invest their money with one or more of the entities he controlled while knowing the investments were not legitimate, that he would make no securities investments on their behalf, and would instead spend their money like it was his own.

2.     Between January 2014 and September 2018, Conley perpetrated the fraud by claiming that he managed multiple private investment funds through his company ALPAX, LLC ("ALPAX") and affiliated shell companies.  Conley induced investors to purchase securities, including purported limited partnership interests, by making a number of materially false and

misleading statements and omissions concerning the legitimacy of the investments and the use of investor proceeds.

3.      Conley told investors that he would invest their money in a variety of ventures, including construction of university student housing, high-yield fixed-income securities, oil and gas technologies and infrastructure, mineral rights leasing, and timber management, among other things. Other times, Conley simply told investors that he ran a private equity company and had an urgent need for investment funds to "close a big deal."  All of these representations were false.

4.      Conley never invested the investor proceeds as promised.  Instead, he comingled the funds in the ALPAX checking accounts that he controlled and used the majority of the funds to support his lavish lifestyle, including private jet charters, luxury automobiles, opulent jewelry and clothing purchases, and to repay other investors with Ponzi-like payments.

5.      To further the appearance of legitimacy and give investors a false sense of security, Conley provided some of his investors with fictitious quarterly account statements, knowing that the balances and gains reported on the statements were entirely false.

6.      By engaging in the conduct described in this Complaint, Conley violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the

Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], Section 21(d) and (e) of the Exchange Act [15

U.S.C. §§ 78u(d), (e)], and Section 209(d) of the Advisers Act [15 U.S.C. §§ 80b-9(d)] to enjoin

such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest,

civil money penalties, and such other and further relief as the Court may deem just and

appropriate.

8.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

22(a) of the Securities Act [15 U.S.C. §§ 77t(b), (d), and 77v(a)], Sections 21(d), 21(e), and 27

of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa], and Sections 209(d) and 214 of the

Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14].

9.      Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the

Advisers Act [15 U.S.C. § 80b-14] because certain of the acts, transactions, events and omissions

giving rise to the violations of the federal securities law alleged herein occurred within the

Northern District of West Virginia as a result of Conley having resided in and maintained an

office in this District during the times relevant to this Complaint.

## **DEFENDANT**

10.     **Phillip W. Conley**, age 37, has a last-known permanent residence in

Morgantown, West Virginia.  From September 2012 through May 2014, Conley was associated

with a registered broker-dealer and previously held Series 7 and 66 securities licenses.  On

December 3, 2015, the Financial Industry Regulatory Authority, Inc. ("FINRA") suspended

Conley from association with a broker-dealer in any capacity for failing to comply with a FINRA

arbitration award.  Conley owned, operated, and controlled ALPAX and its affiliated shell

companies.

## FACTS

**I.    CONLEY FRAUDULENTLY INDUCED INVESTMENTS IN FICTITIOUS SECURITIES AND MISAPPROPRIATED INVESTOR FUNDS**

    **A.    The Fraudulent Entities**

11.    In or around January 2014, Conley formed ALPAX, a West Virginia limited liability company, as a purported consulting and real estate management services company.

12.    Conley was the sole member, owner, and control person of ALPAX and described the company at various times as an investment partnership, an investment fund, or a private equity fund.  It never operated as any of these.

13.    Conley solicited investors during in-person meetings and on the telephone.  He offered and sold, to investors in West Virginia and other states, alleged securities, including limited partnership interests, primarily in one of three purported funds: (1) ALPAX Income Partners II, LP ("ALPAX II"); (2) ALPAX Ventures, LP ("ALPAX Ventures"); and (3) ALPAX Partners VI, LP ("ALPAX VI") (collectively, the "Funds").  The Funds never made any investments as represented.

14.    Conley claimed that ALPAX Management LLC ("ALPAX Management") was the management company and investment adviser for the Funds and charged the Funds annual fees. Conley was the sole owner, founder, and control person of ALPAX Management.

15.    Conley used additional alleged ALPAX entities as part of his scheme, including (1) ALPAX Holdings GP ("ALPAX Holdings"), the alleged General Partner of ALPAX II, and (2) ALPAX Advisors LLC ("ALPAX Advisors"), the alleged General Partner for ALPAX Ventures and ALPAX VI.

16.    The Funds, ALPAX Management, ALPAX Holdings, and ALPAX Advisors (collectively the "ALPAX-Related Entities") had no business operations or assets and were

4

wholly fictitious entities which Conley used to defraud unsuspecting investors.

17.    To give the appearance of a legitimate company, Conley hired a small administrative staff and rented office space in Morgantown, West Virginia, and later in Washington, D.C.  He also opened bank accounts in ALPAX's name but made himself the only authorized signatory on those accounts.

18.    Conley directed investors to write checks to ALPAX, or to wire funds directly to checking accounts held in ALPAX's name.  Conley pooled investor funds into the ALPAX accounts over which he exercised complete control.

19.    Conley portrayed himself as a successful investment professional by driving luxury cars, chartering private jets that he claimed, in some instances, to own, and spending lavishly on clothing and jewelry.  In reality, Conley funded his lifestyle entirely with investor proceeds rather than investing those proceeds as promised.

**B.    The Offering Fraud**

20.    Between January 2014 and September 2018, Conley offered and sold fraudulent investments to at least 20 investors in West Virginia and other states for a total of approximately $5.2 million.

21.    To mislead some investors, Conley provided sham private placement memoranda ("PPMs") that portrayed the Funds as legitimate investment vehicles when, in reality, the Funds were a complete fabrication.

22.    The PPMs contained more than 70 pages of information including, among other things, boilerplate risk factors; investment objectives and related policies and guidelines; and a statement that the funds were exempt from registration under Section 3(c)(1) of the Investment Company Act because they will have fewer than 100 beneficial owners and are not publicly offered.

23.    In the ALPAX II PPM dated November 15, 2015, for example, Conley falsely stated

that investor proceeds would be used to "invest in Student Housing [sic] based real-estate transactions in developed higher education markets concentrated on the east coast of the United States . . . [and] in high yield fixed income securities."

24.     Similarly, in the ALPAX Ventures PPM dated August 2017, Conley falsely stated that investor proceeds would be used to invest in "privately held businesses in the real estate, identity management, oil and gas technologies and infrastructure, mineral rights leasing, and timber management industries."

25.     All of these representations were false.  Rather than invest the funds in accordance with the representations he made in the PPMs, Conley misappropriated investors' funds for his own use.

26.     In addition to the misrepresentations in the PPMs, Conley sent fake ALPAX quarterly account statements to investors that reflected both fictitious account balances and investment returns.

27.     These statements served the dual purpose of lulling investors into believing that Conley had invested their funds as promised and inducing them to invest additional funds under the false pretense that their existing investment was legitimate and profitable.

28.     At least two investors, a married couple, gave Conley additional funds to invest with ALPAX after receiving fabricated quarterly statements showing their respective individual accounts generated positive investment returns.

29.     Between April and August 2015, the couple invested $185,000 with Conley. Conley mailed them quarterly statements, dated December 31, 2015, purporting to show that their investments had generated a "YTD Percentage Yield" of 8.72%.

30.     Following the receipt of these statements, the couple invested an additional

$62,000 with Conley in early 2016 and then made 10 additional investments through January 2018 totaling $250,000.

31.     Conley also made oral misrepresentations to some investors about the nature of their investments and use of investor proceeds.

32.     For example, in or around March 2015, Conley falsely told some investors that their funds would be used to convert apartment buildings and other properties into dormitories for West Virginia University.

33.     To bolster his bogus claim, Conley introduced potential investors to people associated with West Virginia University and obtained courtside seats for a West Virginia Mountaineers men's basketball game.

34.     In June 2017, Conley told an investor about an ALPAX investment opportunity involving the purchase of a power plant in Oklahoma and promised the investor a 20 percent to 30 percent return on a $50,000 investment within six or 12 months.

35.     With other investors, Conley was purposefully vague concerning the use of investor proceeds, telling them generally that he had an urgent need for investment funds to "close a big deal" and that an investment through ALPAX could generate returns ranging between eight and 30 percent.

36.     None of these statements made by Conley to investors concerning the use of their funds were true.

37.     Conley did not use investor proceeds for any investment whatsoever.  Instead, Conley treated investors' funds deposited into the ALPAX bank accounts as his own and used investors' funds to pay for his day-to-day expenses and to fund a lavish lifestyle.

38.     For example, Conley spent almost $1.5 million on travel and leisure, including

$518,000 on private jet rentals alone; $445,000 in cash withdrawals; $566,000 on his personal residence; more than $525,000 to compensate various individuals, including personal assistants and a driver; and approximately $287,000 in Ponzi-like payments.

39.    During the course of the fraud, Conley frequently spent the funds in the ALPAX checking accounts to near depletion before finding another victim to replenish the account with additional funds that were supposed to be earmarked for investment with ALPAX.

40.    For example, in the fall of 2015, Conley received a $200,000 investment after providing the investor with the ALPAX II PPM and telling him that the investment could not lose money.  Conley deposited the investor proceeds into the ALPAX checking account, which at the time had a balance of $138.61.

41.    Within two weeks of that deposit, Conley spent over $150,000, including more than $103,000 to pay for private jet rentals, $10,500 for the rental of his home, over $5,700 for a stay at an upstate New York resort, and more than $7,000 at a Morgantown jewelry store.

## II.    CONLEY VIOLATED THE FEDERAL SECURITIES LAWS

42.    At all relevant times, Conley owned, operated, and controlled ALPAX and the ALPAX-Related Entities.

43.    The investments described above that Conley offered and sold to investors, including the limited partnership interests in the Funds, are securities within the meaning of both the Securities Act and the Exchange Act.

44.    The investments made through ALPAX and in the ALPAX-Related Entities were all in a common enterprise run by Conley, with the expectation of profits to be derived solely from his efforts.

45.    Investors played no role in the management or operations of the business of ALPAX or the ALPAX-Related Entities.

8

46.     Investors provided Conley with an investment of money—between January 2014 and September 2018 approximately 20 investors gave Conley approximately $5.2 million.

47.     Conley pooled investors' money into bank accounts and represented that he would invest those funds in student housing-based real estate transactions, high-yield fixed-income securities, oil and gas technologies and infrastructure, mineral rights leasing, and timber management, among other things, in order to generate the promised returns.

48.     Investors made their investment with a reasonable expectation of profits to be derived solely from Conley's alleged ability to generate profits without any participation by any of his investors.

49.     Conley engaged in the offer and sale of the securities by use of the means or instruments of transportation or communication in interstate commerce, the instrumentalities of interstate commerce, and/or by use of the mails.

50.     The limited partnership interests in the Funds were labeled investments, and investors considered them to be such.  There is no other regulatory scheme that would reduce the risk associated with the limited partnership interests.

51.     Directly or indirectly, Conley made materially false and misleading statements and omissions concerning the legitimacy of the investments and the use of investor proceeds.

52.     Directly or indirectly, Conley knowingly or recklessly made material untrue statements and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading

53.     A reasonable investor would consider the misrepresented facts and omitted information—including, among other items, misrepresentations and omissions regarding the lack of actual investments by Conley, the use of investors' money for Conley's personal expenses,

and using new investments to repay prior investors—important in deciding whether or not to purchase the securities.

54.     The untrue statements of material fact and material omissions described herein were made in the offer or sale and in connection with the purchase or sale of securities.

55.     In connection with the conduct described herein, Conley acted knowingly or recklessly.  Conley knew or was reckless in not knowing that he was making material misrepresentations and omitting to state material facts necessary to make certain statements not misleading under the circumstances.

56.     Conley used devices, schemes, and artifices to defraud investors, and engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon the investors.  Among other things, Conley used investors' funds as his own, misled investors as to the nature of their investments, used investor funds to repay earlier investors, and took careful steps to hide his scheme by providing investors with fictitious quarterly account statements.

57.     Conley was an investment adviser and the founder, control person, and sole owner of ALPAX Management.  Conley made no distinction between himself and ALPAX Management when dealing with investors, and investors generally understood that they were investing assets in funds managed by Conley.

58.     Conley pooled investor funds for his fictitious investments, and had sole authority to trade and make all investment decisions concerning the pooled funds.

59.     Conley advised individual clients to purchase the securities he was offering, and he received compensation through misappropriation of investor's funds for his personal use.

60.     As an investment adviser, Conley owed a fiduciary duty to his clients to act in utmost good faith.  Consistent with this standard, Conley owed a duty to use investors' funds in the manner he promised.

61.     Conley misled investors about the nature of their investments and also the use of the money they invested.

62.     Conley breached this duty by using their assets for his personal use and to repay investors in Ponzi-like fashion.  He pooled investor funds into an account and instead of generating returns from investment activity as promised to investors, he misappropriated the pooled funds.

### FIRST CLAIM FOR RELIEF
**(Violations of Section 17(a) of the Securities Act)**

63.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 62, inclusive, as if they were fully set forth herein.

64.     By engaging in the conduct described above, Defendant Conley knowingly or recklessly, in the offer or sale of securities, directly or indirectly, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

   a.     employed devices, schemes, or artifices to defraud;

   b.     obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c.     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

65.     By engaging in the foregoing conduct, Defendant Conley violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

66.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 62, inclusive, as if they were fully set forth herein.

67.    By engaging in the conduct described above, Defendant Conley knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails or of any facility of a national securities exchange:

      a.    employed devices, schemes, or artifices to defraud;

      b.    made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

68.    By engaging in the foregoing conduct, Defendant Conley violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
**(Violations of Section 206(1) and 206(2) of the Advisers Act)**

69.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 62, inclusive, as if they were fully set forth herein.

70.    By engaging in the conduct described above, Defendant Conley, while acting as an investment adviser, by the use of the means and instrumentalities of interstate commerce and

of the mails, directly or indirectly, knowingly or recklessly has employed devices, schemes, and artifices to defraud his clients and prospective clients; and has engaged in transactions, practices, and courses of business which operate as a fraud or deceit upon his clients and prospective clients.

71.     By engaging in the foregoing conduct, Defendant Conley violated, and unless restrained will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**FOURTH CLAIM FOR RELIEF**
**(Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder)**

72.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 62, inclusive, as if they were fully set forth herein.

73.     Defendant Conley, by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, while acting as an investment adviser, engaged in acts, practices or courses of business that were fraudulent, deceptive and manipulative.

74.     Defendant Conley, while acting as an investment adviser to pooled investment vehicles: (a) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, to investors or prospective investors in the pooled investment vehicle; or (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in the pooled investment vehicle.

75.     By reason of the foregoing, Defendant Conley violated, and unless enjoined and restrained will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendant Conley from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### II.

Permanently restraining and enjoining Defendant Conley from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### III.

Permanently restraining and enjoining Defendant Conley from violating Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] and Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

### IV.

Ordering Defendant Conley to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint; and

### V.

Ordering Defendant Conley to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78(u)(d)(3)], and/or Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## VI.

Granting such other and further relief as this Court may determine to be just and necessary.

Respectfully submitted,

WILLIAM J. POWELL
UNITED STATES ATTORNEY

_/s/ Christopher J. Prezioso_
Christopher Prezioso
West Virginia State Bar No. 9384
Assistant United States Attorney, Civil Division
P.O. Box 591
1125 Chapline Street
Wheeling, WV 26003
Phone: (304) 234-0100
Fax: (304) 234-0112
Email: Christopher.J.Prezioso@usdoj.gov


Karen M. Klotz
Jennifer Chun Barry
Philadelphia Regional Office
One Penn Center
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone:  (215) 597-3100
KlotzK@sec.gov
(_Pro hac vice_ to be filed)

ATTORNEYS FOR PLAINTIFF
**SECURITIES AND EXCHANGE
COMMISSION**

Dated:  April 16, 2020